FILED
CLERK, U.S. DISTRICT COURT

4/29/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: ___MMC___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2025 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>JULIAN PULIDO,<br>  aka "Juls," and<br>CLIFFORD MICHAEL LAVOY,<br>  aka "Buckshot,"<br><br>        Defendants. | EDCR 5:25-CR-00147-FLA<br><br>I N D I C T M E N T<br><br>[18 U.S.C. §§ 1959(a)(1), (3): Violent Crime in Aid of Racketeering; 18 U.S.C. §§ 924(c)(1)(A)(iii), (j)(1): Use, Carry, and Discharge of a Firearm, and Possession of Such Firearm, in Furtherance of a Crime of Violence, Resulting in Death; 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition; 18 U.S.C. § 2(a): Aiding and Abetting; 18 U.S.C. §§ 981, 924, 28 U.S.C. § 2461(c): Criminal Forfeiture] |

    The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

A.   THE RACKETEERING ENTERPRISE

    1.   At all times relevant to this Indictment, defendants JULIAN PULIDO, also known as ("aka") "Juls," and CLIFFORD MICHAEL LAVOY, aka "Buckshot" ("defendants"), and others known and unknown to the Grand Jury, were members and associates of a criminal organization engaged

1

in, among other things, acts involving murder, assaults, trafficking in controlled substances, robbery, extortion, money laundering, and witness intimidation.  At all relevant times, this organization, known as the Mongols Motorcycle Club (the "Mongols" or the "Enterprise"), operated in the Central District of California, and elsewhere.  The Mongols, including its leadership, members, and associates, constituted an "enterprise," as that term is defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, which engaged in, and the activities of which affected, interstate and foreign commerce.  The Mongols constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

B.   BACKGROUND OF THE MONGOLS

At all times relevant to this Indictment:

2.   The Mongols Motorcycle Club is a nationwide and transnational criminal organization that identifies itself as an "outlaw" motorcycle gang.  Mongol members identify themselves with patches, tattoos, and insignia identifying their connection to the gang, and their status within the organization.  Specifically, Mongols will frequently wear leather vests with the "patched" image of a Mongol motorcycle rider (a bald, scowling man with sunglasses and a ponytail) and the name of the member's regional "chapter" sewn

//
//
//
//
//

on the vests.  Below is an example of a Mongols patch, with a picture of the Mongols rider surrounded by the text "Mongols California."



3.   Mongols "officers" will frequently wear patches that indicate that they are officers in the Enterprise.  Additionally, the "Mother Chapter" members, or national officers for the Mongols, will reward members who have distinguished themselves within the organization by presenting them with specific patches or authorizing them to bear a Mongols "full-patch" tattoo.  The Mongols Mother Chapter may award a specific Mongols member a "skull and crossbones" or "Respect Few Fear None" patch to those members who have committed murder or engaged in acts of violence on behalf of the Mongols.

4.     Mongols associate with, and frequently display, the designation of "1%," which is a statement used to distinguish Mongols members from the "99%" of other motorcycle club members who are legitimate and law-abiding.  Mongols define themselves as within the "1%" who are not legitimate and do not adhere to the law or the rights of others.  Members may also wear insignia bearing "MFFM" (an acronym for "Mongols Forever Forever Mongols") or "LMDM" (an acronym for "Live Mongol, Die Mongol").

5.     The gang has approximately 2,500 members, with approximately 1,000 of those members living in Southern California. Members of the Mongols include current or former members of other street gangs operating in Los Angeles County, including the Avenues, 18th Street, San Gabriel Valley, South Side Montebello, Lott Stoner, Maravilla, and Varrio Nuevo street gangs.  The Enterprise is comprised of over 175 "chapters," which are located throughout the United States, Mexico, Canada, Europe, and Asia.

6.     The leadership and governing body of the Mongols is its "Mother Chapter."  The Mother Chapter exercises authority over the actions of individual Mongols members and the regional chapters. Mongols pay money into the Mother Chapter in the form of fees, dues, and "taxes."  Those funds are used, in part, to fund and promote the organization and pay for the legal expenses of Mongols members when they are criminally charged for committing crimes on behalf of the Enterprise.  The Mother Chapter collects and reviews all membership applications and fees for membership, resolves disputes within the organization, and issues incentives, such as tattoos and Mongols patches that honor Mongols members for committing acts of violence on

behalf of the Mongols, incurring physical injury on behalf of the Mongols, or performing specific sexual acts at Mongols events.

7. The Mother Chapter is comprised of the Mongols "national officers." Chapter officers may be invited to present issues to the Mother Chapter for decision. However, chapter officers are not permitted to share in the deliberations of the Mother Chapter, and the Mother Chapter's decisions are binding on the regional chapters. Lower-ranking members and prospective Mongols members frequently are required to patrol and provide armed security against the presence of law enforcement and rival gang members for the Mother Chapter when the Mother Chapter meets. Those present at Mother Chapter meetings are heavily armed, and the Mother Chapter maintains an arsenal of weapons -- including assault rifles, shotgun and semi-automatic handguns, as well as bullet-proof vests and knives -- at the Mother Chapter headquarters in downtown Los Angeles, California.

8. The Mongols maintain an established structure and leadership. The Mongols maintain a written "constitution" and "by-laws" of the organization, which set forth the rules of membership and a code of conduct for the organization, as well as penalties for non-compliance with the rules of the organization.

9. Below the national leadership and Mother Chapter, regional Mongols chapters are directed by chapter officers. These officers include the chapter's "president," "vice-president," "secretary/treasurer," and its "sergeant-at-arms," who is required to maintain the weapons and firearms for the chapter. The sergeant-at-arms may also be required to maintain records of membership applications, and oversee the evaluation of prospective members by private investigators.

10. Mongols crimes typically include acts of violence -- ranging from battery to murder -- as well as drug-trafficking, money laundering, weapons-trafficking, extortion, and hate crimes directed against African-Americans who might come into contact with the Mongols. Members also frequently conduct robberies, steal motorcycles, and engage in the theft of credit card account information to obtain funds for themselves and the organization. Members often commit their crimes and acts of violence with the conviction that they cannot be prosecuted because they believe victims and witnesses are afraid to testify against them or to cooperate with law enforcement for fear of retaliation by the larger Enterprise. Mongols frequently use the reputation of the criminal enterprise, especially its history of large-scale violence and riots, as a means to threaten and intimidate the victims of, and witnesses to, their crimes, and to protect Mongols from prosecution by local law enforcement.

11. The Enterprise is actively engaged in drug trafficking, especially the distribution of methamphetamine and cocaine. Mongols members commonly use methamphetamine and cocaine at Mongols events. More than this, however, Mongols members and leaders frequently engage in the distribution of drugs, especially methamphetamine and cocaine, as a source of income, both within the organization and to outside customers and associates. Proceeds from drug trafficking are then owed to the Mongols leadership and the Mother Chapter and collected in the form of "dues" and membership fees. Large-scale drug traffickers within the organization are often "taxed" at a higher rate within the organization, and their membership in and payments to the larger Mongols organization are used as a means to

protect them from the same types of penalties and "taxes" that would ordinarily be claimed by rival street gangs and Mexican Mafia representatives in the areas controlled by those rival gangs. Mongols members are also authorized to call on other Mongols and Mongols leadership to enforce the collection of proceeds owed from their drug customers.

12. Mongols members enforce the authority of the Mongols by directing attacks against rival motorcycle gangs, such as the Hells Angels, the Vagos, the Outlaws, and the Sons of Silence, as well as members of the general public who might defy or unwittingly come into contact with the Mongols in a way that might be deemed "disrespectful" to the organization. Persons in conflict with, or who might be perceived to have shown disrespect to, Mongols may be beaten severely or even killed by being kicked repeatedly with steel-toed boots, stabbed, or shot. The organization also directs attacks against law enforcement officers and witnesses who would be willing to cooperate with law enforcement for the prosecution of the crimes committed by members of the Mongols, and the organization frequently pays for the legal representation of members who commit crimes, such as assaults and murders, on behalf of the Mongols. The Mongols are ordinarily vigilant to the presence or arrival of rival gang members, and will frequently travel to areas claimed by rival gangs in order to agitate and provoke a confrontation with them. Mongols are likely to identify such persons and threaten to beat or kill them if they do not surrender indicia (such as red and white colored t-shirts, patches, jackets, or sports jerseys bearing the number "81") identifying support for a rival gang. The Mongols organization is also racist and hostile to the presence of African-Americans in bars

or clubs where Mongols are present, or African-Americans in the presence of females associated with the Mongols or Mongols members. The Mongols exclude African-Americans, as well as women, from their membership.

13. Mongols frequently refer to one another as "brothers," and to the organization as a "brotherhood." Leaders of the Mongols gang recruit and initiate new members into the Enterprise through a structured application, vetting, and probationary process that is directed through the Mother Chapter. Potential members must be sponsored by existing members and demonstrate their obedience and loyalty to the Mongols organization. Potential members are then required to complete a written application, which is reviewed and cross-checked by private investigators, and they may be subject to a polygraph examination by the Mongols if they are suspected to be a member of law enforcement or an informant to law enforcement. The focus of the investigation conducted before an individual may become a member of the Mongols is to establish the potential member's willingness to commit crimes on behalf of the organization and to preclude the membership of individuals with any connection to law enforcement or who might expose the crimes of the organization to law enforcement.

14. Once a potential member has passed the process, the potential member may be accepted as a prospective member, or "Prospect." The prospective member is given a vest and patches, which identify him as a Mongols "Prospect." The Prospect is then assigned to perform duties for the Mongols members, including providing armed security, storing weapons and drugs, and transporting Mongols leaders, for a probationary period. The membership

applications and decisions are maintained, reviewed, and determined by the Mother Chapter.

15. The Mongols maintain a ready supply of firearms -- including handguns, shotguns, automatic assault rifles, and machineguns -- in order to enforce the authority of the gang. These firearms are often stolen or unregistered so that their use cannot be readily connected to the gang member who either used or maintained them. Weapons often are discarded or destroyed after an incident. Therefore, gang leaders frequently need to maintain a source of supply for additional unregistered or non-traceable firearms.

16. The Mongols leadership controls the activities of its members and enforces its authority and internal discipline by killing, attempting to kill, conspiring to kill, assaulting, and threatening its own members or others who would present a threat to the Enterprise or its leadership. A member who is "out bad" (i.e., in bad standing) with the Enterprise may be required to forfeit his property, especially his motorcycle, and is subject to attack by active Mongols members.

C. <u>PURPOSES OF THE ENTERPRISE</u>

17. The purposes of the Mongols included, but were not limited to, the following:

    a. Enriching members of the Mongols through, among other things, control of and participation in the distribution of controlled substances in the territory controlled by the Mongols;

    b. Maintaining control and authority over the territory claimed by the Mongols, often through threats, intimidation, and acts of violence against rivals and others;

   c. Preserving, protecting, and expanding the power of the Mongols through the use of threats, intimidation, and acts of violence, including, without limitation, murder, robbery, and assault;

   d. Promoting and enhancing the reputations, authority, and activities of the Mongols and its members and associates; and

   e. Punishing rivals perceived to have disrespected the Mongols and their members and associates.

D. <u>MEANS AND METHODS OF THE ENTERPRISE</u>

  18. The means and methods by which the defendants, and other members and associates of the Mongols, conduct and participate in the conduct of the affairs of the Mongols included the following:

   a. Members and associates of the Mongols commit, attempt to commit, conspire to commit, and threaten to commit acts of violence, including, without limitation, murder, assaults, drug trafficking, money laundering, intimidation, and extortion, to preserve, protect, and expand the Mongol's criminal operations, and to promote discipline and enforce the rules of the Mongols.

   b. Members and associates of the Mongols promote a climate of fear through acts of violence and threats to commit acts of violence, intimidation, and the possession and use of firearms and other weapons, which in turn is intended to promote the authority of the Mongols enterprise and insulate its members from liability for the drug-trafficking and violent crimes of the organization.

   c. Members of the Mongols use the Enterprise to murder, attempt to murder, assault, and threaten those who pose a threat to, or disrespect the Enterprise.

        d.    Members and associates of the Mongols engage in the trafficking of controlled substances as a means to generate income for themselves and the organization.

COUNT ONE

[18 U.S.C. § 1959(a)(1)]

[DEFENDANT PULIDO]

1. Paragraphs 1 through 18 of the Introductory Allegations of this Indictment are re-alleged and incorporated by reference here.

2. At all times relevant to this Indictment, the Mongols, including its leaders, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

3. At all times relevant to this Indictment, the Mongols, through its leaders, members, and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), consisting of:

(a) multiple acts involving:

   i. Murder, in violation of California Penal Code Sections 21a, 31, 182, 187, 188, 189, 190, and 664;

   ii. Extortion, in violation of California Penal Code Sections 21a, 31, 182, 518, 519, and 664;

   iii. Robbery, in violation of California Penal Code Sections 21a, 31, 182, 211, 212, 212.5, and 664;

(b) multiple acts indictable under Title 18, United States Code, Section 1512 (relating to witness and victim tampering);

(c) multiple acts indictable under Title 18, United States Code, Section 1956 and 1957 (relating to money laundering); and

1      (d) multiple offenses involving trafficking of controlled
2  substances in violation of Title 21, United States Code, Sections
3  841(a)(1), 843(b), and 846.
4      4.  On or about March 4, 2025, in San Bernardino County, within
5  the Central District of California, for the purpose of gaining
6  entrance to and maintaining and increasing position in the Mongols,
7  an enterprise engaged in racketeering activity, defendant JULIAN
8  PULIDO, also known as "Juls," willfully, deliberately, and with
9  premeditation, unlawfully murdered V.S., in violation of California
10 Penal Code Sections 187, 189, and 190.

COUNT TWO

[18 U.S.C. §§ 1959(a)(3), 2(a)]

[ALL DEFENDANTS]

1. Paragraphs 1 through 18 of the Introductory Allegations of this Indictment, and Paragraphs 2 and 3 of Count One of this Indictment are hereby re-alleged and incorporated by reference here.

2. On or about March 4, 2025, in San Bernardino County, within the Central District of California, for the purpose of gaining entrance to and maintaining and increasing position in the Mongols, an enterprise engaged in racketeering activity, defendants JULIAN PULIDO, also known as ("aka") "Juls," and CLIFFORD MICHAEL LAVOY, aka "Buckshot," each aiding and abetting the other, knowingly and willfully assaulted V.S., resulting in serious bodily injury, in violation of California Penal Code Sections 31, 245(a)(4), and 12022.7(a).

COUNT THREE

[18 U.S.C. §§ 924(c)(1)(A)(iii), (j)(1)]

[DEFENDANT PULIDO]

On or about March 4, 2025, in San Bernardino County, within the Central District of California, defendant JULIAN PULIDO, also known as "Juls," knowingly used and carried a firearm, during and in relation to, and possessed such firearm in furtherance of, a crime of violence, namely Murder in Aid of Racketeering, in violation of Title 18, United States Code, Section 1959(a)(1), as charged in Count One of this Indictment, and, in doing so, discharged the firearm, resulting in the death of V.S.

COUNT FOUR

[18 U.S.C. § 922(g)(1)]

[DEFENDANT PULIDO]

On or about March 4, 2025, in San Bernardino County, within the Central District of California, defendant JULIAN PULIDO, also known as "Juls," knowingly possessed the following ammunition, in and affecting interstate and foreign commerce:

(1) three rounds of Hornady 9mm caliber ammunition; and

(2) one round of Federal Cartridge 9mm caliber ammunition,

each expelled by the firearm that defendant PULDIO used to shoot and kill V.S.

Defendant PULDIO possessed such ammunition knowing that he had previously been convicted of the following felony crime, punishable by a term of imprisonment exceeding one year:

(1) Assault with a Firearm on a Person, in violation of California Penal Code Section 245(a)(2), in the Superior Court of the State of California, County of Los Angeles, case number KA131230, on or about June 9, 2023.

16

FORFEITURE ALLEGATION ONE

[18 U.S.C. §§ 981(a)(1)(C), 924(d) and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 924(d), and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts One through Two of this Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

    (a) All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses;

    (b) All right, title, and interest in any firearm or ammunition involved in or used in any such offense; and

    (c) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 924(d)(1), and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Three through Four of this Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

   (a) All right, title, and interest in any firearm or ammunition involved in or used in any such offense; and

   (b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the convicted defendant shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

//
//

1  substantially diminished in value; or (e) has been commingled with
2  other property that cannot be divided without difficulty.
3
4                                          A TRUE BILL
5
6                                          /S/_____
7                                          Foreperson
8  BILAL A. ESSAYLI
   United States Attorney
9

10 *[signature: Lindsey Greer Dotson]*

11 LINDSEY GREER DOTSON
   Assistant United States Attorney
12 Chief, Criminal Division

13 J. MARK CHILDS
   Assistant United States Attorney
14 Chief, Transnational Organized Crime
   Section
15
   CHRISTOPHER C. KENDALL
16 Assistant United States Attorney
   Deputy Chief, Transnational Organized
17 Crime Section

18 DECLAN T. CONROY
   Assistant United States Attorney
19 Transnational Organized Crime Section

20 DANIEL H. WEINER
   Assistant United States Attorney
21 Transnational Organized Crime Section

22
23
24
25
26
27
28